[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10979
_____

D.C. Docket No. 8:10-cv-01542-SCB-EAJ

GRANITE STATE INSURANCE COMPANY,
NEW HAMPSHIRE INSURANCE COMPANY,

Plaintiffs - Counter Defendants - Appellees,

versus

AMERICAN BUILDING MATERIALS, INC.,

Defendant - Counter Claimant,

KB HOME, INC.,
KB HOME TAMPA, LLC,

Defendants - Counter Claimants - Appellants.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 3, 2013)

Before O'CONNOR,[*] Associate Justice Retired, and MARCUS and PRYOR,
Circuit Judges.

_____

[*] Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States
Supreme Court, sitting by designation.

PRYOR, Circuit Judge:

In this appeal based on diversity jurisdiction, we are asked to interpret six insurance policies issued by Granite State Insurance Company and New Hampshire Insurance Company to American Building Materials, KB Home, Inc., and KB Home Tampa, LLC, to determine whether the pollution exclusions in those policies exclude coverage for damages associated with the supply and installation of defective Chinese drywall. Because we conclude that the damages fall within the scope of the pollution exclusions, we affirm the grant of summary judgment for the insurers.

## I.  BACKGROUND

KB Home alleges that American Building supplied KB Home with defective gypsum drywall manufactured in China for installation in residential homes in Hillsborough County, Florida. After receiving complaints from homeowners, KB Home hired a consultant who determined that the drywall was emitting unusual amounts of sulfide gases. These gases cause eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and neurological harm. Various state and federal agencies also conducted investigations of the Chinese drywall and determined that the drywall emits sulfur-related chemical compounds that corrode copper wiring in homes in which this drywall is used.

2

During the period from June 15, 2007, to June 15, 2010, American Building carried insurance policies issued by Granite State Insurance Company and New Hampshire Insurance Company.  Under the Granite State policies, Granite State promised to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" to which the policies applied, and to "defend the insured against any 'suit' seeking those damages," subject to some terms and conditions.  Under the New Hampshire Insurance policies, New Hampshire Insurance promised to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured" and to "defend any claim or suit seeking damages covered by the terms and conditions" of the policies.  KB Home Tampa, LLC, and KB Home, Inc., were also insured under these policies.

The insurance policies all contained pollution exclusions.  The Granite State policies excluded coverage for "'[b]odily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."  Those policies defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  The New Hampshire Insurance policies

3

excluded coverage for "[b]odily [i]njury, [p]roperty [d]amage or [p]ersonal [i]njury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world." Those policies defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material."

The insurers filed an action in federal court alleging diversity jurisdiction and sought a declaratory judgment that the insurers had no obligation to defend or indemnify American Building or KB Home "with respect to claims related to allegedly defective drywall supplied by ABM and installed by KB Home." When the action was filed, KB Home and American Building were named as defendants in a number of class-action lawsuits that had been consolidated in the Eastern District of Louisiana by the Judicial Panel on Multidistrict Litigation. See In re Chinese Drywall Products Liability Litigation, No. 2:09-md-02047 (E.D. La.). And KB Home had also filed suit against American Building in Florida state court based upon the defective drywall.

The district court entered a partial summary judgment for the insurers and declared that the insurers had no duty to defend or indemnify KB Home and American Building in the state court action. In the cross motions for summary judgment filed by the parties, the parties disagreed about which body of substantive law should apply to the insurance policies. The insurers asserted that

4

Florida law applied, but KB Home argued that Massachusetts law applied. The district court agreed with KB Home that the policies were governed by Massachusetts law, but concluded that, even under Massachusetts law, the damage from the drywall would be excluded from coverage under the pollution exclusion.

## II. STANDARD OF REVIEW

"We review a grant of summary judgment de novo, considering all evidence and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Legal conclusions are reviewed de novo." OSI, Inc. v. United States, 525 F.3d 1294, 1297 (11th Cir. 2008). Specifically, "[w]e review the district court's choice of law de novo." Shaps v. Provident Life & Accident Ins. Co., 317 F.3d 1326, 1329 (11th Cir. 2003). And "[t]he interpretation of a contract is a question of law that the court reviews de novo." Daewoo Motor Am., Inc. v. Gen. Motors Corp., 459 F.3d 1249, 1256 (11th Cir. 2006).

## III. DISCUSSION

On appeal, the insurers challenge the conclusion of the district court that the insurance policies are governed by the substantive law of the Commonwealth of Massachusetts and assert that Florida law should govern the policies. KB Home argues that Massachusetts law applies, but challenges the interpretation of the substantive law of Massachusetts by the district court. Because we conclude that

5

the damages would be excluded by the insurance policies under either Florida or Massachusetts law, we decline to decide the choice-of-law question.

Under Florida law, the damages from the Chinese drywall would be excluded from coverage under the plain language of the pollution exclusion. See Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So. 2d 1135, 1137–38 (Fla. 1998). The Supreme Court of Florida has held that nearly identical pollution exclusions were clear and unambiguous and should be enforced according to their plain language. See id. at 1136–38. The plain language of the pollution exclusions at issue in this appeal includes the damage from Chinese drywall. The sulfide gas released by the Chinese drywall falls within the definition of "pollutant" because it is a "gaseous . . . irritant or contaminant." And the bodily injury and property damage alleged "would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape" of this pollutant. The Southern District of Florida has reached the same conclusion in at least two cases. First Specialty Ins. Corp. v. Milton Constr. Co., No. 12-20116-Civ., 2012 WL 2912713, at *3–*5 (S.D. Fla. July 16, 2012); Gen. Fid. Ins. Co. v. Foster, 808 F. Supp. 2d 1315, 1320–21 (S.D. Fla. 2011). And several Florida state courts have agreed that claims from defective Chinese drywall "arise solely from damage or injury resulting from the release of

sulfide and other noxious gases" and are "clearly excluded from coverage by the Total Pollution Endorsements."

The Massachusetts courts have adopted a different method of interpretation of these pollution exclusions. "When construing language in an insurance policy, [Massachusetts courts] consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Western Alliance Ins. Co. v. Gill, 426 Mass. 115, 117, 686 N.E. 2d 997, 998 (1997) (alteration and internal quotation marks omitted). The Supreme Court of Massachusetts has counseled that "the [pollution] exclusion has to be interpreted and applied in a commonsense manner with due attention to the circumstances of the accident giving rise a coverage claim" and has explained that the pollution exclusions have generally not been applied to exclude coverage for "injuries resulting from everyday activities gone slightly, but not surprisingly, awry." Id. at 118, 119, 686 N.E. 2d at 999, 1000 (internal quotation marks omitted). This approach does not "limit pollution exclusions to the improper handling of hazardous waste, or other pollution occurring in an industrial setting"; instead it limits such exclusions to harm "caused by the kind of release that an ordinary insured would understand as pollution." McGregor v. Allamerica Ins. Co., 449 Mass. 400, 404, 868 N.E. 2d 1225, 1228 (2007).

The damage caused by the defective Chinese drywall falls within the scope of the pollution exclusion as interpreted by Massachusetts courts for two reasons. First, the defective drywall cannot be considered an "everyday activit[y] gone slightly, but not surprisingly, awry." See Gill, 426 Mass. at 119, 686 N.E. 2d at 1000. Second, the unexpected emission of sulfuric gas is the kind of release that a reasonable insured would understand as pollution. See McGregor, 449 Mass. at 404, 868 N.E. 2d at 1228.

First, the defective Chinese drywall is different in kind from the examples given by the Supreme Court of Massachusetts of everyday activities gone slightly awry. All of the following examples given by the court involved a disproportionate amount of harm from a kind of emission that one would expect to encounter in the particular activity:

> [C]ourts have held that the exclusion, and similar limiting provisions, did not bar coverage for: injuries caused by the ingestion of lead paint, the death of a man who inhaled poisonous fumes when he applied adhesive to install a carpet on his boat; injuries caused by exposure to fumes from toxic cements and solvents and congestive dusts created by rubber fabricating processes; property damage caused by fumes released from muriatic acid used to etch a floor surface; injuries caused by the inhalation of chemical fumes from a carpet; injuries resulting when fumes emanated from cement used to install a plywood floor; injuries sustained from exposure to photographic chemical; injuries to individuals who ingested malathion during a municipal pesticide spraying operation; injuries incurred by a United States Department of Agriculture inspector when a gasket failed in a refrigeration system causing an ammonia leak; paint damage to vehicles which occurred during the spray painting of a bridge; and . . .

injuries suffered by persons exposed to an excessive accumulation of
inadequately ventilated exhaled carbon dioxide in an office building.

Gill, 426 Mass. at 118–19, 686 N.E. 2d at 999–1000.  One would expect the

ingestion of paint to cause health problems, but would not necessarily expect the

paint to contain lead that increases the harm caused by that ingestion.  Similarly,

one would expect inhalation of fumes from the installation of carpeting, painting,

or flooring, but one would not expect the level of harm that resulted from those

fumes.  It is the level of harm instead of the kind of release that was surprising in

those cases.  By contrast, one would not expect drywall to emit a gaseous

substance at all, and certainly not after the drywall has been installed.  The harm

from the defective drywall is different from the mishaps identified in Gill.

Second, the gas released by the drywall is the kind of release that a

reasonable insured would understand as pollution.  The toxic gas from the drywall

is emitted into the air by a passive object and it causes property damage and

personal injury to those exposed to it.  An objectively reasonable insured would

view this release as pollution.  For these reasons, Massachusetts state courts would

find the defect more analogous to an oil spill, see McGregor, 449 Mass. at 404, 868

N.E. 2d at 1228, than an unusually harmful emission of carbon monoxide from an

appliance, see Gill, 426 Mass. at 120, 686 N.E. 2d at 1000, and conclude that

coverage is excluded by the pollution exclusions.

## IV.  CONCLUSION

We **AFFIRM** the grant of partial summary judgment in favor of the insurers.